UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JANET ECKHARDT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:19 CV 2605 ACL |
| ) | |
| ANDREW M. SAUL, ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Plaintiff Janet Eckhardt brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Social Security Administration Commissioner's denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.

An Administrative Law Judge ("ALJ") found that, despite Eckhardt's severe impairments, she was not disabled as she had the residual functional capacity ("RFC") to perform past relevant work.

This matter is pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).  A summary of the entire record is presented in the parties' briefs and is repeated here only to the extent necessary.

For the following reasons, the decision of the Commissioner will be affirmed.

### I.  Procedural History

Eckhardt filed her application for DIB on October 3, 2016.  (Tr. 335-36.)   She claimed she became unable to work on August 3, 2016, due to type II diabetes, hypertension, cerebral

palsy, and hyperlipidemia. (Tr. 360.) Eckhardt was 56 years of age at her alleged onset of disability date. Her application was denied initially. (Tr. 240.) Eckhardt's claim was denied by an ALJ on February 5, 2019. (Tr. 16-27.) On July 26, 2019, the Appeals Council denied Eckhardt's claim for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

In this action, Eckhardt argues that the RFC formulated by the ALJ is not supported by "some medical evidence." (Doc. 19 at pp. 3.)

## II. The ALJ's Determination

The ALJ first found that Eckhardt meets the insured status requirements of the Social Security Act through December 31, 2021. (Tr. 18.) She stated that Eckhardt has not engaged in substantial gainful activity since her alleged onset date of August 3, 2016. *Id.* In addition, the ALJ concluded that Eckhardt had the following severe impairments: diabetes mellitus, obesity, degenerative joint disease, obstructive sleep apnea, degenerative disc disease, peripheral vascular disease (with prior femoral bypass surgery), and chronic obstructive pulmonary disease ("COPD"). *Id.* The ALJ found that Eckhardt did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 21.)

> As to Eckhardt's RFC, the ALJ stated:
>
> > After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a), except the claimant can never operate foot controls; never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs, as well as balance stoop, kneel, crouch, and crawl. She can have no concentrated exposure to extreme heat, extreme cold, unprotected heights, hazardous machinery, and/or respiratory irritants such as

>   dust, fumes, odors, gases, or poor ventilation.

(Tr. 21-22.)

The ALJ found that Eckhardt was capable of performing past relevant work as an assembler. (Tr. 26.) The ALJ therefore concluded that Eckhardt was not under a disability, as defined in the Social Security Act, from August 3, 2016, through the date of the decision. *Id.*

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on September 30, 2016, the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

(Tr. 27.)

### III.  Applicable Law

### III.A.  Standard of Review

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance of the evidence, but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence

on the record as a whole, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).   The Court must also consider any evidence which fairly detracts from the Commissioner's decision.   *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).   However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.   *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).   "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."   *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); s*ee also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

**III.B.  Determination of Disability**

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience engage in any kind of substantial gainful work which exists … in significant numbers in the region where such individual lives or in several regions of the country."  42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. § 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."  *Dixon v. Barnhart*, 343 F.3d 602, 605 (8th Cir. 2003).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b).  These abilities and aptitudes include (1) physical

functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, reaching out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id*. § 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on his ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or his physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. § 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a

consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id*. If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n. 5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### IV.  Discussion

Eckhardt argues that the RFC formulated by the ALJ is not supported by medical evidence. Specifically, Eckhardt contends that the ALJ erred in affording no weight to the opinions of treating physician Christian M. Sutter, M.D.

"It is the ALJ's function to resolve conflicts among the various treating and examining physicians." *Tindell v. Barnhart,* 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting *Vandenboom v. Barnhart,* 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)).  The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." *Prosch v. Apfel,* 201 F.3d 1010, 1012-13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." *Id.* at 1013 (quoting *Bentley v. Shalala,* 52 F.3d 784, 785-86 (8th Cir. 1997)).  The ALJ is not required to rely on one doctor's opinion entirely or choose between the opinions. *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011). Additionally, when a physician's records provide no elaboration and are "conclusory checkbox" forms, the opinion can be of little evidentiary value. *See Anderson v. Astrue,* 696 F.3d 790, 794 (8th Cir. 2012).  Regardless of the decision the ALJ must still provide "good reasons" for the weight assigned the treating physician's opinion.  20 C.F.R § 404.1527(d)(2).

The ALJ must weigh each opinion by considering the following factors: the examining and treatment relationship between the claimant and the medical source, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the physician provides support for his findings, whether other evidence in the record is consistent with the physician's findings, and the physician's area of specialty.  20 C.F.R. §§ 404.1527(c)(1)-(5), 416 .927(c)(1)-(5).

Dr. Sutter's treatment notes are summarized as follows:

On October 23, 2015, Eckhardt presented for follow-up regarding her diabetes.  (Tr. 455.)  She reported she was not monitoring her blood pressure at home. *Id.*  Dr. Sutter noted no abnormalities on examination.  (Tr. 458.)  He diagnosed Eckhardt with type II diabetes

mellitus without complication, benign essential hypertension, mixed hyperlipidemia, and non-morbid obesity.  (Tr. 460.)  He continued Eckhardt's diabetes and hypertension medications, and instructed her to continue home blood pressure monitoring.  *Id.*  Dr. Sutter also counseled Eckhardt on increasing physical exercise, losing weight, and eating healthy.  *Id.*

Eckhardt next saw Dr. Sutter on August 17, 2016, at which time she presented to "review disability paperwork."  (Tr. 463.)  Eckhardt reported that she was recently let go from employment as a factory worker due to "loss of points."  *Id.*  She indicated that she was applying for disability benefits due to a history of cerebral palsy with poor lower extremity mobility, and difficulty with urinary incontinence.  *Id.*  Dr. Sutter noted that Eckhardt had a history of poor medication compliance, which she attributed to difficulty affording medication since she lost her job.  *Id.*  Eckhardt's blood pressure was elevated at 144/83.  *Id.*  She reported that her home blood sugars have been sporadic, although she did not have a log.  *Id.*  Eckhardt also reported missing her medications often.  *Id.*  Upon examination, Eckhardt was in no distress, she had normal range of motion of the neck, normal range of motion on musculoskeletal exam, and normal neurological exam.  (Tr. 466-67.)  Dr. Sutter diagnosed Eckhardt with type 2 diabetes mellitus without complication, benign essential hypertension, history of cerebral palsy, and non-compliance with medication treatment.  (Tr. 468.)  He continued Eckhardt's medications, instructed her to keep a log of her home blood sugars and blood pressure, and referred her to physical medicine and rehab for "further evaluation of gainful employment."  *Id.*

In September 2016, Eckhardt reported that she was back on her husband's insurance.  (Tr. 471.)  Her blood pressure was elevated.  *Id.*  She was not checking her blood pressure at home and was unsure if she was taking her prescribed blood pressure medication.  *Id.*  Eckhardt

had been sporadically monitoring her home blood sugars.  *Id.*   Eckhardt complained of left anterior hip pain that comes and goes and resulted in difficulty walking.  *Id.*   She was taking Tylenol for her pain.  *Id.*   Dr. Sutter found Eckhardt exhibited tenderness of the left hip on examination.   (Tr. 475.)   He diagnosed Eckhardt with lumbar radiculopathy and ordered x-rays of the left hip and lumbar spine.  (Tr. 478.)   Dr. Sutter found that Eckhardt's diabetes was "not controlled with poor medication compliance."  (Tr. 477.)   He adjusted Eckhardt's diabetes medications and encouraged her to monitor her glucose at home.  *Id.*   Dr. Sutter also found Eckhardt's blood pressure was "not at goal," and that she had a history of poor medication compliance.  *Id.*   He encouraged her to take her medication, monitor her blood pressure daily, keep a log, and start a low sodium diet.  *Id.*

On October 25, 2016, Eckhardt reported increased stress related to her father being placed in hospice.  (Tr. 482.)   She was tearful in the office.  *Id.*   Her blood pressure was elevated, and she was not monitoring her blood pressure at home.  *Id.*   On examination, Dr. Sutter found Eckhardt's mood was anxious and depressed and her affect was angry.   (Tr. 486.) He encouraged Eckhardt to establish care with a counselor or therapist for treatment of her grief. (Tr. 487)

Eckhardt next saw Dr. Sutter for follow-up on March 30, 2017, at which time she reported intermittent left knee pain.  (Tr. 2411.)   She had seen an orthopedist three days prior, who diagnosed her with osteoarthritis and prescribed Meloxicam[1]  for pain and inflammation *Id.*   Eckhardt also complained of lumbar back pain and bilateral leg cramping while walking. *Id.*   Resting improved her pain.  *Id.*   Eckhardt's blood pressure was elevated, and she reported

---

[1]Meloxicam is a nonsteroidal anti-inflammatory drug indicated for the treatment of arthritis. *See* WebMD, http://www.webmd.com/drugs (last visited September 24, 2020).

being out of medication for the past week.  *Id.*  Dr. Sutter indicated that he had ordered labs for Eckhardt's diabetes in September 2016, but Eckhardt had not had them drawn.  *Id.*  Upon examination, Eckhardt had normal musculoskeletal range of motion but exhibited tenderness in the left upper leg and bilateral lower legs.  (Tr. 2415.)  Her neurological examination was normal.  *Id.*  Dr. Sutter diagnosed Eckhardt with chronic bilateral low back pain with bilateral sciatica, primary osteoarthritis of the left knee, and bilateral calf pain.  (Tr. 2416.)  He continued the Meloxicam and instructed her to follow up with orthopedics.  *Id.*  Dr. Sutter also instructed Eckhardt to obtain the previously ordered labs, monitor her blood sugars, monitor her home blood pressure, and increase her physical activity.  *Id.*

Eckhardt next saw Dr. Sutter for follow-up on August 11, 2017.  (Tr. 2466.)  Eckhardt reported that she was hospitalized for two days on June 15, 2017, for vomiting and hypoglycemia.  *Id.*  Her diabetes medications had been adjusted during her hospitalization.  *Id.*  Eckhardt was a "poor historian" and was unsure of the medications she was taking.  *Id.*  Dr. Sutter indicated that Eckhardt had a history of peripheral vascular disease, for which she was treated by Dr. Ketan Desai.  *Id.*  She had undergone a femoral popliteal bypass graft[2] on May 26, 2017, with no complications.  *Id.*  Eckhardt also had a history of chronic low back pain and osteoarthritis of the left knee, which was "stable."  *Id.*  She had undergone x-rays of the hips in April 2017, which revealed degenerative changes in the lower lumbar spine and bilateral hips.  (Tr. 2472.)  Eckhardt reported that her hips hurt with ambulation.  (Tr. 2466.)  She was taking Meloxicam, but discontinued home physical therapy because she did not think it was necessary.  *Id.*  Eckhardt also reported that she was only able to go up or down one flight of stairs due to

---

[2] A vascular prosthesis of synthetic material that circumvents an obstruction in the femoral artery. *Stedman's Medical Dictionary* 284 (27th ed. 2000).

shortness of breath.  *Id.*   Upon examination, Eckhardt's cardiovascular, pulmonary, and neurological exams were normal.  (Tr. 2470-71.)   Dr. Sutter indicated Eckhardt's sugars were uncontrolled.  (Tr. 2472.)   He directed her to monitor her blood sugars at home, keep a log, start a low sugar and low carb diet, engage in aerobic exercise thirty minutes most days, and continue taking her prescribed medications.  *Id.*   Dr. Sutter referred Eckhardt to home conditioning due to her peripheral vascular disease and physical deconditioning.  *Id.*   He instructed her to increase physical activity.  *Id.*

Dr. Sutter completed a "Physical Residual Functional Capacity Questionnaire" on October 26, 2018.  (Tr. 3275-78.)   Dr. Sutter indicated that Eckhardt established care with him in January 2012, and that he saw her every one-to-six months.  (Tr. 3275.)   He listed Eckhardt's diagnoses as diabetes mellitus II, osteoarthritis, hypertension, obesity, cerebral palsy, gastroesophageal reflux disorder ("GERD"), and major depressive disorder.  *Id.*   Eckhardt had symptoms of fatigue, poor exercise tolerance, depressed mood, lower back pain, knee pain, and hip pain.  *Id.*   Dr. Sutter listed clinical findings and objective signs of physical deconditioning with muscle atrophy of lower extremities, and degenerative changes seen on x-rays.  *Id.*   Dr. Sutter indicated that Eckhardt's symptoms would frequently interfere with attention and concentration needed for simple work tasks.  (Tr. 3276.)   Dr. Sutter expressed the opinion that Eckhardt could walk a half of a city block without rest or severe pain; sit for thirty minutes at a time and sit a total of four hours in an eight-hour workday; stand for fifteen minutes at a time and stand a total of less than two hours in an eight-hour workday; must walk around every thirty minutes for one to five minutes; requires the ability to shift positions at will from sitting, standing, and walking; requires unscheduled ten-minute breaks every hour; must use a cane or other assistive device while standing or walking; can occasionally lift or carry less than ten

pounds and can rarely carry ten pounds; can occasionally look down, turn head right or left, look up, and hold head in a static position; can use her hands and fingers for fine manipulations and grasping only fifteen percent of the time during a workday; and can reach overhead with her arms only five percent of a workday; and would likely be absent from work due to her impairments three to four days a month. (Tr. 3276-77.) Finally, Dr. Sutter noted that Eckhardt has limited vision due to her poorly controlled diabetes and limited ability to handle stress due to her depression. (Tr. 3278.)

The ALJ first acknowledged that Dr. Sutter was Eckhardt's "long-term primary care physician." (Tr. 25.) She then indicated that she was assigning "no weight" to Dr. Sutter's opinions regarding Eckhardt's limitations, as they were unsupported by the record. *Id.*

Eckhardt contends that the ALJ erred by providing "no discussion of inconsistencies in the opinion of Dr. Sutter." (Doc. 19 at p. 5.) The undersigned disagrees.

The ALJ offered the following explanation for her decision to discredit Dr. Sutter's opinions:

> This physician limited the claimant to sitting only four hours during an eight-hour day. This is not supported by any of the medical records. Her standing and walking limitations to which she testified find little support in the treatment records, as well. This physician also restricted the claimant's neck movements, stress the need for unscheduled breaks, and added that the claimant faced limitations to her hands. However, the treatment records provide no support for these limitations. As a result, the undersigned gives these limitations no weight.
>
> The undersigned notes that this provider indicated that the claimant faced limitations because of her cerebral palsy. However, her records note no documentation of that impairment. While this physician indicated limitations relating to the claimant's degenerative disc disease, she has only required minimal treatment for that impairment. Additionally, the records note that the claimant's peripheral vascular disease improved dramatically after surgery. Therefore, any significant limitation resulting from that impairment seems mostly unsupported by the records. These records note that her BiPAP helped the claimant's obstructive sleep apnea. She has little documentation of monitoring her diabetes mellitus.

(Tr. 25.)

The undersigned finds that the ALJ offered good reasons for discrediting Dr. Sutter's opinions. First, Dr. Sutter's opinions were not supported by his own treatment notes. As the ALJ noted, Eckhardt did not see Dr. Sutter between October of 2015 and August 17, 2016. (Tr. 22.) The purpose of her August 17, 2016 visit was solely to have Dr. Sutter complete disability paperwork due to her recent employment termination. (Tr. 463.) Eckhardt alleged the following impairments were disabling: history of cerebral palsy, poor lower extremity mobility, and urinary incontinence. *Id.* Dr. Sutter noted no abnormalities or difficulties with ambulation on examination, and no diagnoses of cerebral palsy or urinary continence. (Tr. 466-68.) Dr. Sutter referred Eckhardt to physical medicine and rehab for evaluation, although there is no indication in the record Eckhardt saw the recommended physician. (Tr. 468, 23.) The only findings noted on musculoskeletal examination were tenderness of the left hip in September 2016 (Tr. 475) and tenderness in the left upper leg and bilateral lower legs in March 2017 (Tr. 2415). Dr. Sutter found Eckhardt had full range of motion and was normal neurologically. (Tr. 475, 2415.) He repeatedly advised Eckhardt to increase her physical activity. (Tr. 460, 2426, 2472.)

The ALJ accurately noted that Dr. Sutter's finding that Eckhardt could only sit four hours during an eight-hour day was not supported by his treatment notes. (Tr. 25.) Although Eckhardt complained of difficulty walking and climbing stairs, the record contains no reports or findings on examination that would justify sitting limitations. Further, Dr. Sutter's opinions that Eckhardt had significant limitations in her neck movement and use of her hands are wholly unsupported by the medical record. *Id.* In fact, Dr. Sutter specifically found that Eckhardt had normal range of motion of the neck during his August 2016, September 2016, October 2016, and

March 2017 examinations. (Tr. 466, 475, 486, 2414.) *See Toland v. Colvin*, 761 F.3d 931, 935-36 (8th Cir. 2014) (finding that "ALJ had sufficient reason to discount" treating provider's opinion where he "included limitations in the MSS that are not reflected in any treatment notes or medical records") (quotation marks and citation omitted). Although Eckhardt has been diagnosed with degenerative disc disease, the ALJ accurately noted that she has only received conservative treatment for this impairment consisting of prescription of a nonsteroidal anti-inflammatory drug. (Tr. 14.) The ALJ stated that Dr. Sutter provides no support for a need for frequent unscheduled breaks. *Id.* Thus, contrary to Eckhardt's claim, the ALJ specifically explained why Dr. Sutter's limitations were not supported by the medical evidence.

Eckhardt argues that Dr. Sutter's finding that Eckhardt would be absent from work three to four days a month due to her impairments is supported by her hospitalizations in 2017 and 2018. The undersigned will discuss these hospitalizations in turn.

First, Eckhardt notes she was hospitalized for nine days in January 2017 for nausea, vomiting, and diarrhea. (Tr. 1157-58.) As the ALJ pointed out, Eckhardt was found to be noncompliant with her medications at this time and had high glucose levels as a result. (Tr. 23, 898.)

Second, Eckhardt cites a May 2017 hospitalization for her left femoral bypass procedure. (Tr. 2704.) Eckhardt underwent this procedure due to claudication symptoms to her left leg following ambulation. *Id.* The ALJ noted that the subsequent records do not detail significant symptoms or treatment related to this impairment, indicating the surgery was successful. (Tr. 23-24.) In September 2017, Eckhardt's vascular surgeon indicated there was no evidence of arterial insufficiency to the left foot and instructed Eckhardt to follow-up in six months. (Tr. 2498.)

Third, Eckhardt indicates she was hospitalized for three days in June of 2017 for vomiting.  (Tr. 1545-59.)   The cause of the vomiting was "unclear," but was "possibly medication related," and possibly viral.  (Tr. 1549.)   Although the ALJ did not discuss this admission, there is no indication it resulted from Eckhardt's chronic conditions treated by Dr. Sutter.

Fourth, Eckhardt cites her admission for four days in January 2018 for treatment of bronchitis and a urinary tract infection.  (Tr. 1761.)   The ALJ discussed this admission, pointing out Eckhardt was given antibiotics and recovered quickly.  (Tr. 24, 1761-62.)

Fifth, Eckhardt was admitted for three days in April 2018 for suicidal thoughts after her father's death.  (Tr. 655.)   She had stopped taking her insulin at that time and received treatment for this as well.  (Tr. 648-49.)   The ALJ considered this admission in evaluating the severity of her mental impairments.  (Tr. 19.)   The ALJ ultimately concluded that Eckhardt's mental impairment was not severe, and Eckhardt does not challenge this finding.  (Tr. 21.)

Finally, Eckhardt notes she was hospitalized for eight days in August 2018 for acute respiratory failure.  (Tr. 675-78.)   The ALJ discussed this admission.  (Tr. 24.)   Eckhardt reported nausea, vomiting, cough, and some shortness of breath.  (Tr. 677.)   Her husband recently had an illness as well.  *Id.*   It was noted that Eckhardt may have sleep apnea, but she had not followed up with her primary care physician.  *Id.*   Eckhardt underwent a stress test and chest x-rays, both of which were negative.  *Id.*   Pulmonary testing was consistent with a restrictive ventilatory defect.  (Tr. 877, 707.)   An outpatient sleep study was recommended.  She was treated with IV antibiotics and fluids.  *Id.*   Eckhardt was also treated with a BiPAP[3] machine during her admission.  (Tr. 677.)

---

[3]BiPAP "stands for Bilevel Positive Airway Pressure, and is very similar in function and design

Eckhardt fails to demonstrate how these hospitalizations support the need for a limitation of three to four work absences a month. It is true that Eckhardt had a significant number of hospitalizations in 2017 and 2018, but they were unrelated to her chronic conditions for which Dr. Sutter was treating her. The hospitalizations related to viral infections, a successful surgical procedure, Eckhardt's noncompliance with her medications, and an episode of depression following the death of her father. Although Eckhardt was treated for pulmonary problems and sleep apnea during her August 2018 hospitalization, there is no indication these impairments would result in frequent absences. These conditions were treated effectively with the use of a BiPAP during Eckhardt's hospitalization. As the ALJ pointed out, Eckhardt received follow-up treatment for her sleep apnea after her discharge and was fitted for ongoing BiPAP treatment. (Tr. 877-79.)

In sum, the ALJ did not err in rejecting the opinions of Dr. Sutter. Dr. Sutter's treatment notes reveal Eckhardt received conservative treatment for her impairments and few abnormalities were noted on examination. Significantly, Dr. Eckhardt's opinions were based in part on a diagnosis of cerebral palsy, yet there is no evidence Eckhardt had an active diagnosis of cerebral palsy at any time during the relevant period. Dr. Sutter found Eckhardt had significant limitations with regard to sitting and the use of her hands when his treatment notes are silent as to any deficits in these areas. Finally, Dr. Sutter's treatment notes are replete with references to

---

to a CPAP machine (continuous positive airway pressure). Similar to a CPAP machine, a BiPAP machine is a non-invasive form of therapy for patients suffering from sleep apnea. Both machine types deliver pressurized air through a mask to the patient's airways. The air pressure keeps the throat muscles from collapsing and reducing obstructions by acting as a splint. Both CPAP and BiPAP machines allow patients to breathe easily and regularly throughout the night." http://www.alaskasleep.com/blog/what-is-bipap-therapy-machine-bilevel-positive-airway-pressure (last visited 9/25/2020).

Eckhardt's noncompliance with medications and other treatment recommendations. The ALJ pointed out these instances of noncompliance when discussing Dr. Sutter's records. (Tr. 23-24.)

The ALJ next considered the opinion of state agency physician Kenneth Smith, M.D. (Tr. 25.) On November 15, 2016, Dr. Smith expressed the opinion based on a review of the record that Eckhardt was capable of performing the full range of medium work. (Tr. 237-38.) The ALJ indicated that she was assigning "little weight" to this opinion, as more recent treatment and other records indicate more significant limitations. (Tr. 25.)

It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of her limitations. *Pearsall*, 274 F.3d at 1217. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). There is no requirement, however, that an RFC finding be supported by a specific medical opinion. *See Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012). Furthermore, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Cox*, 495 F.3d at 619-20.

The ALJ concluded that Eckhardt had the RFC to perform sedentary work with the following additional limitations: can never operate foot controls; never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs, as well as balance, stoop, kneel, crouch, and

crawl; and can have no concentrated exposure to extreme heat, extreme cold, unprotected heights, hazardous machinery, or respiratory irritants such as dust, fumes, odors, gases, or poor ventilation.  (Tr. 22.)

The ALJ's RFC determination is supported by substantial evidence in the record as a whole.  In her discretion, the ALJ made an RFC finding that did not precisely reflect any of the medical opinions of record.  *See Martise*, 641 F.3d at 927 (ALJ is not required to rely entirely on one particular physician's opinion or choose between opinions).

The medical evidence does not support that Eckhardt's combination of impairments is severe enough to preclude her from performing all work.  No examining physician has cited any limitations, other than Dr. Sutter.  As discussed above, the ALJ properly rejected Dr. Sutter's opinions as unsupported by his treatment notes and the other evidence of record.

The ALJ's determination is supported by the opinion of the state agency physician, who found Eckhardt was capable of performing the full range of medium work.  The ALJ nonetheless credited Eckhardt's allegations in imposing a significantly more restricted RFC due to her combination of impairments.  A restriction to a limited range of sedentary work adequately accounts for Eckhardt's documented ambulatory difficulties due to her musculoskeletal impairments, vascular impairment, and diabetes.  The ALJ also imposed environmental limitations in consideration of Eckhardt's pulmonary impairments.  Eckhardt has failed to demonstrate the presence of greater limitations than those found by the ALJ.

Accordingly, Judgment will be entered separately in favor of Defendant in accordance with this Memorandum.

**/s/** Abbie Crites-Leoni  
ABBIE CRITES-LEONI  
UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of September, 2020.